# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KERISSA PETTY, | ) |
| Plaintiff, | ) ) ) |
| v. | ) ) Case No. 16-CV-109-GKF-FHM |
| DEPARTMENT OF HUMAN SERVICES; ED LAKE, in his individual capacity; SHANA YINGLING, in her individual capacity; HALLY KIRBY, in her individual capacity; and JOHN DOES 1-10, | ) ) ) ) ) ) ) |
| Defendants. | ) |

## OPINION AND ORDER

Before the court is the Motion for Summary Judgment [Doc. No. 55] of defendant Shana Yingling ("Yingling"). For the reasons set forth below, the motion is granted.

### I. Background

This dispute arises from the Oklahoma Department of Human Services' removal of plaintiff Kerissa Petty's ("Petty's") two children, S.P. and R.P., from her custody. On March 18, 2015, Petty gave birth to S.P., a premature baby weighing 1 lb., 12 oz. [Doc. No. 56-1, pp. 55, 62]; [Doc. No. 56-2, p. 7]. Both Petty and her newborn tested positive for methamphetamine, among other substances. [Doc. No. 56-1, p. 55]; [Doc. No. 56-2, pp. 5–9].[1] As a result, Petty was told that ODHS would be notified and would conduct an investigation. [Doc. No. 56-2, pp. 10–11].

On March 20, 2015, ODHS received a referral from the hospital concerning Petty's drug use and potential child endangerment. [Doc. No. 56-1, pp. 10–11, 54]. That matter was assigned to Yingling, an ODHS child welfare specialist. [*Id.* at 6, 10–11]. On March 27, 2015, Yingling

---
[1] S.P. remained in a neonatal intensive care unit ("NICU") for three (3) months. [Doc. No. 56-2, p. 7].

contacted Petty and was granted an in-home interview. [*Id.* at 11]; [Doc. No. 56-2, pp. 11–12]. During that interview, Petty admitted to using methamphetamine during her pregnancy. [Doc. No. 56-1, pp. 13–14]; [Doc. No. 56-2, p. 19]. Consequently—and in light of the hospital's referral—Yingling determined an additional investigation was warranted. [Doc. No. 56-1, p. 15]. But to protect Petty's children, Yingling also wished to implement an Immediate Protective Action Plan ("IPAP")—a temporary, non-judicial modification of custodial rights. [*Id.* at 15–18]. Yingling presented the IPAP as an alternative to formal removal and proceedings involving the district attorney. [*Id.* at 20, 42–43]; [Doc. No. 56-2, p. 26–28].

The IPAP—entered March 27, 2015—bears the signatures of Petty, her husband, and Yingling [Doc. No. 56-2, p. 69], and was signed in the presence of Petty's mother [*id.* at 24]. Specifically, it required Petty's mother to: (1) take temporary custody of R.P.; and (2) supervise hospital visits between Petty and S.P., who remained in the NICU. [*Id.* at 67–70]. The IPAP lasted for a period of seven (7) days, [*id.* at 67], after which a formal out-of-home safety plan ("Safety Plan") was executed, [*id.* at 73–76]. That plan—executed on April 3, 2015—was signed by Petty, Petty's mother, Yingling, and Yingling's supervisor, and imposed the same requirements and conditions as the IPAP. [*Id.* at 76]. And like the IPAP, the Safety Plan was presented as an alternative to formal removal proceedings. [*Id.* at 35–38]. On April 14, 2015, Petty entered into a separate Family Services Agreement ("FSA"). [*Id.* at 55–58]; [Doc. No. 56-1, pp. 67–68]. The FSA did not modify or limit Petty's custodial rights, but instead provided for substance abuse treatment and counseling. [Doc. No. 56-1, pp. 67–68]. Yingling's involvement with the case ended on or about that same day. [Doc. No. 55, p. 12, ¶ 24].

Petty filed suit on August 17, 2015. Her sole surviving claim is under 42 U.S.C. § 1983 against Yingling in her individual capacity for a deprivation of parental rights without due

process of law. Specifically, Petty claims that her "consent" to the IPAP, Safety Plan, and FSA was neither voluntary nor intelligent. Yingling now seeks summary judgment, arguing: (1) Petty cannot establish a violation of her due process rights as a matter of law; and (2) she is entitled to qualified immunity.

## II. Legal Standard

Summary judgment shall be granted if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the evidence permits a rational trier of fact to resolve the issue either way. *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 644, 670 (10th Cir. 1998). A fact is "material" if it is essential to the outcome of the case. *Id.* On review, a court must examine the record in the light most favorable to the party opposing summary judgment. *Wolf v. Prudential Ins. Co. of Am.*, 50 F.3d 793, 796 (10th Cir. 1995). But "the nonmoving party may not rest on its pleadings [and] must set forth specific facts showing that there is a genuine issue for trial as to those dispositive matters for which it carries the burden of proof." *Applied Genetics Int'l, Inc. v. First Affiliated Secs., Inc.*, 912 F.2d 1238, 1241 (10th Cir. 1990). Indeed, bare allegations, without evidentiary support, will not suffice. *See Joe Hand Promotions, Inc. v. Kinder*, No. 11-CV-450-GKF-PJC, 2012 WL 5494926, at *2 (N.D. Okla. Nov. 13, 2012).

## III. Analysis

### A. Constitutional Violation

Section 1983 provides a cause of action against any person who deprives an individual of federal rights or liberties under color of state law. 42 U.S.C. § 1983. "[P]arents enjoy a protected liberty interest 'in the care, custody, and control of their children.'" *Arredondo*, 462 F.3d at 1297 (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000)). To that end, state officials

may not temporarily remove children from a home "without affording . . . parents due process of law." *Arredondo*, 462 F.3d at 1298. Indeed, due process ordinarily "requires that the state provide parents with pre[-]deprivation notice and hearing—that is, notice and opportunity to be heard *before* state officials remove children from the home." *Id.* (emphasis in original) (quotation marks and citation omitted). A post-deprivation hearing, however, may be justified in extraordinary circumstances. *Spielman v. Hildebrand*, 873 F.2d 1377, 1385 (10th Cir. 1989).

Of course, the right to a hearing may be waived. *Winters v. Bd. of Cty. Comm'rs*, 4 F.3d 848, 856 n.11 (10th Cir. 1993) ("[A] party may waive the right to a due process hearing[.]"); *Kirkland v. St. Vrain Valley Sch. Dist. No. Re-1J*, 464 F.3d 1182, 1195–96 (10th Cir. 2006); *McGee v. Boren*, 58 F. App'x 436, 438 (10th Cir. 2003). And a parent's custodial rights may be modified by voluntary agreement. *Cf. Elwell v. Byers*, 699 F.3d 1208, 1217 (10th Cir. 2012) (observing that the notice provisions of a Foster Care Placement Agreement governed the scope of the foster parents' liberty interest); *Spielman*, 873 F.2d at 1384–85 (noting that state officials' "right to remove the children was restricted by the written preadoption agreement").

Indeed, "a parent's voluntary consent to a safety plan obviates the need for any additional due process procedures on the part of [an] agency seeking to remove [a] child from a parent's custody." *See Teets v. Cuyahoga Cty.*, 460 F. App'x 498, 503 (6th Cir. 2012). Put differently, "[b]ecause [a] safety plan is voluntary, no hearing of any kind is necessary." *See Dupuy v. Samuels*, 465 F.3d 757, 761 (7th Cir. 2006). However, "it is improper to obtain consent to a safety plan through duress or other illegal means," including a misrepresentation of facts. *See Hernandez ex rel. Hernandez v. Foster*, 657 F.3d 463, 482, 487 (7th Cir. 2011); *Dupuy*, 465 F.3d at 762.

Simply offering the choice between immediate removal—on the one hand—and a family safety plan—on the other—does not constitute duress. Often, as in this case, "the state will offer [a] parent[ ] the option of agreeing to a 'safety plan'" restricting custody and contact with a child "pending completion of the state's investigation into abuse or negligence." *See Dupuy*, 465 F.3d at 760. Indeed, such plans are a sensible, perhaps unavoidable, "partial solution to the agonizingly difficult problem" of balancing parental rights with a child's "right to be protected against abuse and neglect." *See id.* at 763; *cf. Arredondo*, 462 F.3d at 1293–94 (describing the conflict as "wrenching"). Admittedly, refusing a safety plan may leave a parent "in a worse pickle than if [s]he had accepted it." *See Dupuy*, 465 F.3d at 761. But "[t]hat is a dilemma implicit in any settlement process"—without a downside to the alternative, "there would be no settlements." *See id.*

And it is no answer to say that Petty "did not *really consent*—that the state 'coerc[ed]' [consent] to safety plans by threatening to remove the child" in the absence of agreement. *See id.* at 762. The law does not forbid a threat "merely to enforce one's legal rights." *See id.* Thus, the initial question is whether Yingling reasonably suspected child abuse so as to render threatened removal, investigation, and proceedings lawful. *See id.*; *Hernandez*, 657 F.3d at 482–83; *Arredondo*, 462 F.3d at 1298. Here, Yingling had ample evidence of endangerment by drug use—namely, admissions from Petty, [Doc. No. 56-1, pp. 28, 34–35; Doc. No. 56-2, pp. 5–6, 19], and positive drug tests obtained from Petty and her newborn, [Doc. No. 56-1, p. 55, 68–69].[2] Thus, this is not a case where a social worker "offers a . . . plan when it has no suspicion at all of neglect or abuse" or threatens removal without proper legal authority. *See Dupuy*, 465 F.3d at 762–63. It is simply a case involving a choice. *See id.* at 762.

---

[2] Those findings were confirmed by the results of an additional drug test on April 2, 2015. [Doc. No. 56-2, p. 71].

The only remaining question is whether Petty's choice was knowing and voluntary. *First*, Petty argues she was not apprised of the right to a pre-deprivation hearing. [Doc. No. 22, p. 3, ¶¶ 14–15]; [Doc. No. 69, pp. 12–15]. But Yingling did, in fact, note the alternative to the safety plans—judicial proceedings instigated by the district attorney. [Doc. No. 56-1, pp. 20–21, 42–43; Doc. No. 56-2, pp. 27]. Indeed, the specter of such proceedings forms part of the basis for Petty's coercion challenge. *See* [Doc. No. 56-2, pp. 27]; [Doc. No. 23, pp. 2–3, ¶¶ 11, 16]. In any event, the Constitution does not require that social workers recite every detail of custody removal procedures a parent may be entitled to before executing a safety agreement. *See* 10A O.S. §§ 1-4-202, 203A, 204. Oklahoma law merely prescribes processes for child removal and placement; it does not guarantee a substantive result. *See* 10A O.S. § 1-4-203A (requiring a hearing within two (2) days of a child's removal from custody); *Id.* § 1-4-204 (describing child placement); *Id.* § 1-4-202 (describing then-existing emergency custody hearing procedures), *repealed by* 2016 Okla. Sess. Law Serv. Ch. 10 (S.B. 1194).[3] "'[P]rocess is not an end in itself,'" *see Elwell*, 699 F.3d at 1214 (quotations and citation omitted), and the court declines to mandate *Miranda*-style prophylactic warnings for waiver of a parent's custodial rights by agreement. In short, Petty's waiver of the substantive right of custody and control dispensed with the need for any additional procedures. *See Teets*, 460 F. App'x at 503 (consent to a safety plan "obviates the need for any additional due process procedures").

It is true that the Mayes County District Court rejected an ODHS affidavit requesting custody of Petty's children on April 13, 2015. [Doc. No. 56-1, pp. 79–80]. But that does not change the result in this case. Petty complains that Yingling never informed her of the state

---

[3] Petty repeatedly suggests the choice created by voluntary safety plans is not authorized by statute. *See* [Doc. No. 22, pp. 5–6, ¶¶ 29–30, 35]. That is neither unusual nor unconstitutional. *See, e.g.*, *Dupuy*, 465 F.3d at 761 ("It is not surprising that the safety-plan program is not embodied in a statute or formal regulation . . . It imposes no obligation on anybody.").

court's decision before she consented to the safety agreements. [Doc. No. 69, pp. 13–14]. Of course not—Special Judge Gore was not contacted until weeks *after* execution of the IPAP and Safety Plan. [Doc. No. 56-1, pp. 79–80]; [Doc. No. 56-2, p. 69, 76]. The only agreement entered after that date—the FSA—provided for drug counseling and treatment, not a modification of Petty's custodial rights. [Doc. No. 56-1, pp. 67–68]. Therefore, Judge Gore's after-the-fact guidance could not possibly bear on Petty's consent to the IPAP and Safety Plan.[4]

*Second*, Petty claims she was not allowed to review Yingling's case file or challenge the evidence against her. [Doc. No. 22, pp. 3–5, ¶¶ 13, 24]. Due process does not require that either. Social service workers need not conduct *de facto* mini-hearings or permit examination of all evidence prior to negotiating a safety plan. *Cf. Dupuy*, 465 F.3d at 761–63; *Teets*, 460 F. App'x at 503. Indeed, such a requirement may discourage states from offering voluntary safety plans at all, if stripped of their informality and flexibility. In any case, Petty's argument misses the mark here, where she was informed of—and admitted to—the conduct giving rise to suspicion of child endangerment. *See* [Doc. No. 56-1, pp. 28, 34–35, 55, 68–69; Doc. No. 56-2, pp. 5–6, 19].

*Third*, Petty alleges Yingling only presented portions of the plans for her signature. [Doc. No. 22, p. 3, ¶ 12].[5] Not so. To start, the signatures of Petty and her husband appear on all of the executed agreements. [Doc. No. 56-2, pp. 67–70] (IPAP); [*id.* at 73–76] (Safety Plan); [*id.* at 56–57] (FSA admission). And Petty's testimony establishes she received and understood the

---

[4] In any event, Yingling's previous actions were consistent with Special Judge Gore's later instruction to "work with the family to correct conditions that led to the incident." [*Id.* at 80]. Thus, regardless of timing, placing Petty's children in the temporary custody of family members—as opposed to ODHS—was consistent with the Mayes County District Court's guidance. [Doc. No. 70, p. 41].
[5] Though Petty appears to abandon this claim in her response, the court addresses it in an abundance of caution.

terms of the plans. *See* [*Id.* at 22–26, 28, 34–38, 43–45, 51]. With respect to the IPAP, Petty acknowledges that the agreement accurately depicts her conversation with Yingling on March 27, 2015, concerning: (1) evidence of drug abuse[6]; (2) the temporary placement of R.P.—Petty's oldest child—with her mother; and (3) restrictions on Petty's visitation rights with her newborn. [*Id.* at 22–23]. So too with the April 2015 safety plan. [*Id.* at 37–40].

In other words, all material terms and conditions of the plans were communicated and agreed to by Petty. Both agreements expressly note they were "discussed with the person(s) responsible for the child(ren) (PRFC) and others authorized to implement or monitor the implementation of the plan," and that "[a]ll parties agree[d] to fully participate . . . to keep the child(ren) safe, while the Oklahoma Department of Human Services (DHS) completes the safety evaluation." [*Id.* at 68]; *see also* [*id.* at 76]. Both also contain statements that the "[s]ignatures below indicate a full understanding and agreement with the plan[s]." [*Id.* at 69, 76]. That suffices to establish Petty's voluntary agreement to both the IPAP and the Safety Plan. *See Baltimore v. Quinn-Mims*, No. 10 C 1031, 2012 WL 3598212, at *10–11 (N.D. Ill. Aug. 20, 2012). Any assertion to the contrary must be supported by more than Petty's say-so. *See McDonald v. Boeing Co.*, 602 F. App'x 452, 456 (10th Cir. 2015) (affirming summary judgment where plaintiff "provide[d] no evidence for [an] assertion other than his own say-so").

Petty correctly notes that she received only portions of an FSA signed on April 14, 2015. [Doc. No. 56-1, pp. 24–25]. But that does not save her claim. In fact, the FSA is wholly irrelevant to Petty's consent claim. To start, the FSA did not alter Petty's custodial rights at all;

---

[6] Petty claims to identify a "serious[ ] flaw[ ]" on the IPAP form—namely, reference to a positive drug test on March 27, 2015, when the results of a hair follicle test were not known until April 2, 2015. [Doc. No. 69, p. 2]. But as discussed above, Petty tested positive for methamphetamine on March 18, 2015, while in the hospital. Thus, Petty's allegation does not raise a "genuine" dispute.

8

rather, it provided her with substance abuse treatment and counseling. [*Id.* at 67–68]. And even if the omitted pages were somehow relevant, they merely serve internal investigatory and documentation purposes for ODHS, and do not describe the terms and conditions of the safety plan. *See* [Doc. No. 56-1, pp. 47–53]; [*id.* at 21, 25] (describing withheld pages as "a checklist for us, and those are items that are discussed in our . . . meeting . . . with the Family Centered Service Worker to let her know what we felt like the safety threats are").[7] For each of the agreements in question—the IPAP, the Safety Plan, and the FSA—terms and conditions appeared in the documents signed, and were communicated to Petty in their entirety. [Doc. No. 56-2, pp. 67–70, 73–76]; [*id.* at 20–26, 34–40, 42–46, 49–52]; [Doc. No. 56-1, pp. 36–43]. Because she voluntarily agreed to them, the court concludes no violation of Petty's constitutional rights occurred.

## B. Qualified Immunity

Qualified immunity operates as a complete defense to a § 1983 claim. *See Arredondo v. Locklear*, 462 F.3d 1292, 1297 (10th Cir. 2006); *see Hollingsworth v. Hill*, 110 F.3d 733, 737–38 (10th Cir. 1997). In considering immunity, a court asks: "(1) whether the alleged conduct violated a constitutional right, and if so, (2) whether the law was clearly established at the time of the defendant's actions." *Arredondo*, 462 F.3d at 1297 (quotation marks and citation omitted). As discussed above, Petty cannot establish the violation of any procedural due process rights. *Supra*, at 4–9. But even if she could, Yingling is still entitled to immunity on grounds that such rights were not "clearly established."

---

[7] In addition, Petty did not receive a blank, unexecuted "Family Service Agreement Acceptance" form [Doc. No. 56-1, p. 51]. The form explicitly states it "does not replace" any "individualized service plan[ ] or family intervention plan"—*i.e.*, the IPAP and Safety Plan. [*Id.*]. Thus, the fact Petty did not receive a copy of the form did not affect her substantive or procedural rights. To the contrary, as described above, the FSA required only substance abuse treatment and counseling. [*Id.* at 67–68].

9

A right is "clearly established" if a reasonable person in the defendant's position would have known that his or her conduct violated the right. *See Hollingsworth*, 110 F.3d at 738. To be sure, parents possess a clearly established right to a hearing before—or promptly after—being deprived of the custody, care, and management of their children. *See id.* at 740. But that is not the precise question raised by this case. Courts are generally cautious "'not to define clearly established law at a high level of generality.'" *See Callahan v. Unified Gov't of Wyandotte Cty.*, 806 F.3d 1022, 1028 (10th Cir. 2015) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). And while "a case directly on point is not required, existing precedent must have placed the . . . question beyond debate." *See Callahan*, 806 F.3d at 1028 (quotation marks and citation omitted).

Petty cannot satisfy that standard here. Properly focused, this case concerns what qualifies as voluntary consent to a safety plan. And no caselaw clearly establishes the rights asserted by Petty here. Indeed, the parties have not produced, and the court has not uncovered, any precedent that: (1) flatly prohibits social workers from offering safety plans as an alternative to formal investigation and removal; (2) imposes *Miranda*-style prophylactic warnings prior to waiver of a due process hearing; (3) demands parents be permitted to inspect or challenge a social worker's file or findings before executing a safety plan; or (4) requires the disclosure of more than the material terms and conditions of a safety plan as a condition of obtaining consent. *See Edison v. Owens*, 515 F.3d 1139, 1148 (10th Cir. 2008) (applying "clearly established" test to the law of consent and granting qualified immunity where caselaw did not address, *inter alia*, the interplay between coercive factors and signed consent forms); *see also* [Doc. No. 69, pp. 6–7].

And the lack of analogous caselaw in this area is unsurprising. "The competing constitutional interests" at issue when balancing family integrity against possible child abuse "are so powerful that courts have struggled to find adequate superlatives." *See Arredondo*, 462 F.3d at 1293–94. These interests are "amorphous" and balancing them "has proved difficult" in practice. *See Martinez v. Mafchir*, 35 F.3d 1486, 1490 (10th Cir. 1994). In such cases—where the existence and scope of a right are context-dependent and subject to balancing—"the right can rarely be considered 'clearly established' . . . in the absence of closely corresponding factual and legal precedent." *See Baker v. Racansky*, 887 F.2d 183, 187 (9th Cir. 1989). That is the case here. At the time of the alleged conduct, the rights Petty asserts were not clearly established, and, accordingly, Yingling is entitled to qualified immunity.[8]

WHEREFORE, Yingling's Motion for Summary Judgment [Doc. No. 55] is granted.

IT IS SO ORDERED this 24th day of April, 2017.

*[signature]*
GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT

---

[8] This ruling supersedes the court's order of June 9, 2016, denying Yingling's motion to dismiss Petty's Third Amended Petition on qualified immunity grounds. [Doc. No. 21, p. 6].